AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> **01/25/2022**
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: ___ clj ___ DEPUTY

UNITED STATES OF AMERICA,

v.

BRENTON CHERRIE,

Defendant

Case No.  2:22-mj-00338-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 12, 2022 in the County of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*DEA SA Drew Kalies*
*Complainant's signature*

DEA SA Drew Kalies, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  ___January 25, 2022___

_____
*Judge's signature*

City and state:  Santa Barbara, California

Hon. Louis A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Samuel J. Diaz (213) 894-3045

**AFFIDAVIT**

I, Drew Kalies, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Brenton Cherrie ("CHERRIE") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Drug Enforcement Administration ("DEA"), in Camarillo, California, as described more fully in Attachment A:

   a.    a grey LG Flip phone bearing IMEI #359908101233519 ("SUBJECT DEVICE 1");

   b.    a black Samsung Galaxy smartphone in a black case bearing IMEI #357013299269458 ("SUBJECT DEVICE 2"); and

   c.    a blue Android smartphone in a black case bearing IMEI #864862044569091 ("SUBJECT DEVICE 3").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) 846 (conspiracy and attempt to distribute controlled substances); 860 (possession with intent to distribute within 1,000 feet of a school zone); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more

fully in Attachment B.  Attachments A and B are incorporated
herein by reference.

4.  The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent with the DEA and have been so
employed since March 2003.  I am currently assigned to the Los
Angeles Field Division's Ventura Resident Office, an enforcement
group investigating narcotics trafficking and money laundering
violations under Titles 18 and 21 of the United States Code.
While attending the DEA Training Academy in Quantico, Virginia,
I received specialized training concerning violations of the
Controlled Substances Act, contained within Title 21 of the
United States Code.  Since then, I have conducted numerous
investigations and made multiple narcotics-related arrests.  I
have interviewed defendants and cooperating informants with
knowledge of narcotics trafficking.  From these experiences, I
have gained insight and knowledge related to, among other
things, the methods and tactics that narcotics traffickers use

to communicate about narcotics transactions, buy and sell narcotics, and conceal their illegal conduct from law enforcement.  Before working for the DEA, I worked for approximately three years as a police officer for the New York Police Department.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On January 12, 2022, a marked Ventura Police Department black and white patrol vehicle conducted a vehicle stop on a white Ford utility truck for driving with an expired registration.  The vehicle stop occurred within 1,000 feet of Lincoln Elementary School in Ventura, California.  CHERRIE was the driver and sole occupant of the truck.

7.   The officer approached the truck and CHERRIE rolled down his window.  When CHERRIE rolled down his window, the officer smelled a strong odor that he recognized as the odor of burnt marijuana.  The officer also saw, in plain view, a glass bong on the cup holder located to the front of the dash.

8.   Another officer arrived and the two officers instructed CHERRIE to step out of the vehicle and removed a pocket-knife from CHERRIE's person.  Based on the presence of readily accessible marijuana in a smoking device that was in plain view, officers began to conduct a search of the vehicle.

9.   In the truck, officers found a loaded, black 9mm semi-automatic un-serialized handgun, commonly referred to as a "ghost gun," with an attached silencer and high capacity magazine.  They also found a second loaded semi-automatic 9mm ghost gun, loaded handgun magazines, Kevlar body armor, a 50-

round drum magazine, approximately 1,908.5 grams of suspected marijuana, approximately 341.2 grams of suspected psilocybin mushrooms, approximately 13.3 grams of a white powdery substance believed to be fentanyl,[1] as well as $4,750 in United States currency.

10.   The officers placed CHERRIE under arrest and found SUBJECT DEVICE 1 in CHERRIE's pant pockets during the search incident to arrest.  They also found SUBJECT DEVICES 2 and 3 inside the truck.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   On January 12, 2021, Officers Conducted a Traffic Stop of CHERRIE's Vehicle and Found Drugs and Guns Inside**

12.   On January 12, 2022, at approximately 3:53 a.m., Ventura Police Department Officer Matthew Allen was operating a marked black and white police vehicle while on patrol in Ventura, California.  The marked police vehicle was headed eastbound on Santa Clara Street, approaching Ann Street, following a white Ford utility truck, bearing California license plate number 6T95416.  The officer noticed that the registration on the vehicle expired in October 2021, and that by driving with an expired registration, the driver was in violation of California Vehicle Code Section 4000(a)(1) (driving with expired

---

[1] The approximate weights provided for the suspected marijuana, psilocybin mushrooms, and fentanyl consist of the total weight, including packaging materials.  The suspected narcotics have not yet been tested.

registration).  The officer then activated his front facing red
and blue lights and initiated a traffic stop on the truck.  The
stop occurred in the vicinity of Hemlock and Santa Clara Streets
in Ventura, California, which is within 1,000 feet of Lincoln
Elementary School.

13.  Officer Allen then approached the vehicle from the
passenger side and, from prior contacts, identified CHERRIE as
the driver and sole occupant of the vehicle.  Upon approach,
CHERRIE rolled down his passenger side window.  When CHERRIE
rolled down his window, Officer Allen smelled a strong odor that
he recognized as the odor of burnt marijuana.  Additionally, he
saw a glass bong on the cup holder located to the front of the
dash.  The bong had a large round base with a long bent tube and
a stem connected to a removable bowl.  The officer noticed that
the bowl appeared to be filled with yellow liquid.  Within the
bowl was a burnt, black and green leafy substance.  Based on the
officer's training and experience, he knew that this device was
used to inhale marijuana smoke and that having an uncovered,
readily usable amount of marijuana within the bowl of the bong
was a violation of California Vehicle Code Section 23222(b)(1).

14.  Officer Allen then informed CHERRIE that he was being
stopped for driving with an expired registration.  CHERRIE said
that he believed the registration did not expire until February
and that he had a valid driver's license.  The DMV return for
the vehicle later confirmed that the registration had expired on
October 31, 2021.  During this time a second officer, Officer
Brian Gregory, arrived at the scene to assist.

15.   CHERRIE was asked if he had any weapons on his person
and he replied that he had a pocket-knife.  CHERRIE was then
escorted out of the vehicle.   The officers removed the knife
from CHERRIE's pocket before directing him to sit on a nearby
curb.  CHERRIE informed the officers that he had come from
Chumash Casino and was headed back to his friend's residence.
CHERRIE also said that there were no illegal items or weapons in
his truck and denied the officers consent to search the truck
for illegal items.  Based on the presence of readily accessible
marijuana in a smoking device that was in plain view, officers
began to a conduct a search of the vehicle for more packaged or
possessed marijuana.

16.   On the front center seat under a flannel shirt, within
arms' reach of the driver's seat, officers found a semi-
automatic un-serialized Polymer80 Glock 26 style "ghost gun."
The firearm had a long, black cylindrical attachment to the
barrel that officers recognized to be a silencer.  Additionally,
the handgun had a 30-round magazine loaded with 9mm ammunition.

17.   Following the identification of the weapon in the
vehicle, Officer Allen walked back to CHERRIE and told him to
place his hands on his head.  CHERRIE informed Officer Allen
that Officer Allen was not supposed to be inside of CHERRIE's
vehicle and that he was going to sue the officers.  CHERRIE was
then placed under arrest without incident.

18.  After he was placed under arrest, CHERRIE complained
that the officers searched his truck without probable cause
similarly to how his property was searched during a prior

warrant service.  CHERRIE was then escorted to a patrol vehicle where he was searched incident to arrest.  During this search, the officers seized SUBJECT DEVICE 1 from CHERRIE's pants pocket.

19.  CHERRIE stated that Officer Allen should know that he needs what he had in his seat (i.e. the gun) and that it was unfair that Officer Allen carried one on his hip if he could not carry one in his vehicle.  CHERRIE was then placed in the rear seat of the patrol vehicle where CHERRIE was read his Miranda Rights directly from a Ventura Police issued Miranda card.  CHERRIE did not acknowledge his Miranda rights and stated that the officers had violated his rights.  CHERRIE did not invoke his Miranda rights or request counsel.

20.  Due to the presence of the illegally possessed firearm and firearm accessories, including a silencer, a search of the vehicle for additional related illegal items was conducted.  Officers recovered the following items:

a.  From a backpack on the passenger seat: a set of Kevlar body armor; a second semi-automatic un-serialized Polymer 80 glock 26 style "ghost gun" loaded with a transparent detachable magazine with 9mm ammunition rounds including one in the chamber; a 9mm handgun barrel with a round inside; a black 50-round 9mm drum magazine;

b.  From a red cooler on the passenger seat: a plastic bag containing a leafy green substance that officers identified as marijuana which was further contained within multiple separate plastic bags and a digital scale;

       c.   From a second red cooler on the passenger side floorboard: a plastic bag containing a large quantity of dehydrated white and brown mushrooms packaged in separated medium sized plastic bags;

       d.   From a book in one of the truck lockers: a Psilocybin Bible book;

       e.   From a small blue clutch-style bag on the passenger side floorboard: assorted styles of handgun magazines loaded with 9mm ammunition;

       f.   From a black and silver metal case on the dashboard in front of the passenger side: a crystalline substance in a jar containing an unknown drug; a white powdery substance suspected to be fentanyl in a jar; purple gel tabs suspected to contain LSD from within black pill bottle; and a scale.

       g.   From a black pouch with a yellow interior located in a crate on the floorboard of the center seat of the passenger compartment: twelve small plastic baggies all containing a white powdery substance suspected to contain fentanyl with a gross weight of 13.3 grams;

       h.   From behind the truck's headrests and seats: a silver foil bag that contained a plastic bag inside which had approximately 560.7 grams of suspected marijuana.

       i.   Underneath the center seat: a leather wallet containing approximately $4,750 in United States currency.

       j.   Beneath the front seat: SUBJECT DEVICES 2 and 3.

21.  Based on CHERRIE's possession of suspected controlled substances while also in possession of firearms, the officers determined that CHERRIE acted in violation of California Health and Safety Code Section 11370.1(a) (possession of a controlled substance while armed).  Additionally, based on CHERRIE'S possession of various suspected controlled substances, the excessive quantity of substances well beyond that for personal use, the prepackaged suspected controlled substance, the assortment of unused plastic baggies, the multiple scales and large quantity of cash on his person, officers believed that he possessed the substances for the purpose of sales, in violation of California Health and Safety Code Section 11378 (possession of a controlled substance for sale).  Based on CHERRIE'S transportation of the substance for the purpose sales, the officers determined that CHERRIE acted in violation of Health and Safety Code Section 11352(a) (transportation of a controlled substance).  Following his arrest, CHERRIE was driven to the Ventura Police Department.

**B.    Post-arrest Interview of CHERRIE.**

22.  On January 12, 2022, at approximately 6:00 a.m., CHERRIE was interviewed by Ventura Police Department detectives concerning his arrest.  CHERRIE was not re-<u>Mirandized</u> prior to this interview.

23.  CHERRIE stated that he lives in the back of his truck.  The truck is registered under his former business "Brenton Cherrie Works."  CHERRIE stated he lived in the truck by himself.

24.  CHERRIE stated he uses marijuana and admitted the marijuana in the vehicle all belonged to him.  He admitted to selling marijuana but said it was infrequent.  He said sometimes he would sell more, like when Covid first came out.  He said it was lucrative and he could make money in his sleep.

25.  CHERRIE was asked about the psilocybin mushrooms. CHERRIE stated he does not grow mushrooms anymore.  He did not grow the mushrooms found in the vehicle.  CHERRIE was asked if he made money selling the mushrooms and he said, "not really" and said it is more of a therapy thing for him.  He said he uses them himself and does micro doses of mushrooms.  He said he infrequently sold mushrooms.  He said he mostly sold CBD.

26.  CHERRIE was asked about the firearms located inside the vehicle.  CHERRIE said too many things happen to innocent people so he carried the firearms.  CHERRIE believed everyone should be carrying firearms because there are a lot of bad people living in the streets.  CHERRIE said he had been robbed himself before.

27.  CHERRIE stated he built the firearms himself by ordering the parts online and picking up parts from gun stores. He said the drum magazine and the other magazines were ordered online.  There were companies online that ship them to California.  He said he used to have a federal license to carry a firearm when he lived in Texas.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

28.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their cell phones and other digital devices.

c.  Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

29.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

12

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

30.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

13

31.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

14

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Brenton CHERRIE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Brenton CHERRIE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.      **CONCLUSION**

35.  For all of the reasons described above, there is probable cause to believe that Brenton CHERRIE has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 25th day of
January, 2022.

_____
UNITED STATES MAGISTRATE JUDGE